**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| CIELO JEAN GIBSON, et al.,<br>        Plaintiffs,<br><br>        v.<br><br>FIRST MERCURY INSURANCE<br>COMPANY,<br>        Defendant. | No. 3:21-cv-1522 (SRU) |

## RULING ON DEFENDANT'S MOTION TO DISMISS

In 2018 and 2019, three groups of professional models each brought a lawsuit against three different gentlemen's clubs alleging that each club unlawfully used the models' images and likenesses. Each club requested a defense and sought indemnification from its commercial general liability insurer, First Mercury Insurance Company ("First Mercury"). In each case, First Mercury denied having duties to defend and indemnify the club. Eventually, each suit came to a resolution by which the club assigned its rights under the salient First Mercury policy to the plaintiffs.

Many of the plaintiffs in the underlying lawsuits now bring suit as assignees of the clubs, seeking a declaration that First Mercury owes each club a duty to defend it and indemnify it in the underlying litigation, and seeking damages arising from First Mercury's failure to do so. First Mercury continues to deny any duty to defend or indemnify the underlying insureds, and it moves to dismiss this coverage action.

Because the Plaintiffs plausibly allege that First Mercury had a duty to defend its insureds and because it would be premature to rule on First Mercury's duty to indemnify the underlying defendants at this time, I **deny** First Mercury's motion to dismiss.

I.    **Background**

A.  <u>Allegations</u>

1.  *The Underlying Lawsuits[1]*

Plaintiffs Cielo Jean Gibson, Dessie Mitcheson, Marketa Kazdova, Brooke Taylor,

Jessica Burciaga, Brooke Banx, Lina Posada, Joanna Krupa, Marta Andretti, Arianny Celeste

Lopez, Abigail Ratchford, and Tara Leigh Patrick are twelve professional models who were

plaintiffs in one or more lawsuits filed against three gentlemen's clubs insured by First Mercury

under a materially identical commercial liability insurance policy ("the Policy"): Mr. Happy's,

Inc., in Connecticut; Liberty Entertainment Group, LLC, in Arizona; and KHG of San Antonio,

L.L.C., in Texas.  Compl., Doc. No. 1, at 4 ¶ 20.

a.  The Connecticut Action

Plaintiffs Cielo Jean Gibson, Dessie Mitcheson, Marketa Kazdova, Brooke Taylor

(collectively, "the Connecticut Plaintiffs") sued Mr. Happy's, Inc. d/b/a Mr. Happy's Cafe ("Mr.

Happy's"), and its owner Frederick Toupin (collectively, "the Mr. Happy's Defendants"), in the

United States District Court for the District of Connecticut.  *Id.* at 2 ¶ 4; *Nobriga, et al. v. Mr.*

*Happy's Inc.,* Dkt. No. 19-cv-868 (JAM) (D. Conn. June 5, 2019) ("the *Connecticut Action*").

The Connecticut Plaintiffs principally alleged that the Mr. Happy's Defendants used each

plaintiff's image in advertising without her consent to "promote" the "strip club," even though

each plaintiff had never been "employed by . . . or otherwise . . . affiliated or associated with"

Mr. Happy's, received no remuneration for the club's use of her images, and the use "create[d]

---

[1] A district court may consider certain materials without converting a motion to dismiss into one for summary judgment, including any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in the complaint by reference.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted).  In the recitation of the allegations, I supplement the pleadings with references to certain legal documents from the underlying lawsuits, which were appended to the pleadings by the Plaintiffs, *see* Tricario Dec., Doc. No. 16, at 2 ¶ 4, or are incorporated by reference in the Complaint.

the false impression" that each plaintiff had "worked at" or "endorsed" the club.  Conn. Compl.,

Doc. No. 19-1, at 1 ¶ 1, 11 ¶¶ 48-50, 12 ¶ 54, 13 ¶¶ 61-65 ("Connecticut Complaint").  As a

result, each plaintiff was "deprive[d]" of income "relating to the commercialization of [her]

Images;" and harmed by the "implication" that she is a "stripper, endorse[s] a strip club, or [is]

otherwise associated or affiliated with a strip club."  *Id.* at 12 ¶¶ 57, 59.  The Connecticut

Plaintiffs alleged, on information and belief, that the Mr. Happy's Defendants did so "with the

intent of causing" each plaintiff "irreparable harm."  *Id.* at 13 ¶ 66.

In addition, the Connecticut Plaintiffs alleged that the Mr. Happy's Defendants were "at

least negligent" in publishing the relevant images, because the Mr. Happy's Defendants "knew,

or should have known, that Plaintiffs were not employed by the Club, had no affiliation with the

Club, had not consented to the use of their Images, and had not been compensated for the use of

their Images;" that the Mr. Happy's Defendants were "negligent in their failure to promulgate

policies and procedures concerning the misappropriation of the Images of models that were used

on the Mr. Happy's Cafe websites and social media accounts;" or that the Mr. Happy's

Defendants "negligently failed to enforce those policies, communicate them to employees,

and/or supervise their employees in order to ensure that these policies, along with [f]ederal and

Connecticut [law], were not violated."  *Id.* at 20 ¶ 147, 22 ¶¶ 155-157.

The Connecticut Plaintiffs brought suit for (1) violation of section 43 of the Lanham Act,

15 U.S.C. § 1125(a)(1), which prohibits false or misleading representations of fact in commercial

advertising, and the false or misleading use of a person's image for commercial purposes; (2)

violation of the plaintiffs' common law right of privacy, with respect to the defendants'

appropriation of the plaintiffs' likenesses; (3) violation of the plaintiffs' common law right of

privacy, based on publicity that unreasonably placed the plaintiff in a false light before the

public; (4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.

Stat.§ 42-110b; (5) defamation; and (6) various common law torts, including conversion. *Id.* at 1

¶ 2.

After the Connecticut Action was filed, the Mr. Happy's Defendants tendered the

complaint to First Mercury. Compl., Doc. No. 1, at 6 ¶ 34, 8 ¶¶ 48-49. First Mercury, asserting

that the Policy excluded the alleged conduct from coverage, denied a defense and

indemnification. *Id.*

The *Connecticut Action* ultimately settled. *Connecticut Action*, Doc. No. 76. The terms

of the settlement were not provided to the Court. As a result of the settlement, instant plaintiffs

Cielo Jean Gibson, Dessie Mitcheson, Marketa Kazdova, and Brooke Taylor were assigned the

Mr. Happy's Defendants' rights in its First Mercury insurance policy. Compl., Doc. No. 1, at 3

¶¶ 12, 13.

     b.  The Arizona Action

Plaintiffs Jessica Burciaga, Brooke Banx, Lina Posada, Joanna Krupa, Marta Andretti,

Arianny Celeste Lopez, and Abigail Ratchford (collectively, "the Arizona Plaintiffs") sued

Liberty Entertainment Group, LLC ("Liberty"), owner of the Dream Palace, in the Superior

Court of Arizona, Maricopa County. *Id.* at 2 ¶ 5; *see also Burciaga, et al. v. Liberty*

*Entertainment Group, LLC, et al.*, Dkt. No. CV2018-052191 (Ariz. Super. Ct. Apr. 24, 2018)

("the *Arizona Action*").

The Arizona Plaintiffs principally alleged that Liberty used each plaintiff's image in

advertising for the purpose of "promoting, advertising, and marketing" the Dream Palace, even

though she did not consent to or authorize such use. *See generally* Ariz. Compl., Doc. No. 19-3

("Arizona Complaint"). The Arizona Plaintiffs also alleged that Liberty "acted "at a minimum

. . . with reckless indifference" by "expressly permitting, allowing and condoning" the use of the plaintiffs' images on its website and/or social media and, thereby, potentially creating a "false and misleading impression" about the plaintiffs.  *Id.* at 18 ¶ 56, 23 ¶ 88.

The Arizona Plaintiffs brought suit for (1) violation of the common law right of publicity, with respect to misappropriation of their likeness; (2) violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1); and (3) violation of plaintiffs' Brooke Banx and Abigail Ratchford's common law right of privacy based on publicity that unreasonably places each of them in a false light before the public.  *See generally* Ariz. Compl., Doc. No. 19-3.

After the Arizona Action was filed, Liberty tendered the complaint to First Mercury, and First Mercury denied defense and coverage, asserting that the relevant commercial general liability policies excluded the alleged conduct from coverage.  Compl., Doc. No. 1, at 11 ¶ 70-71.

The parties to the *Arizona Action* entered into a consent judgment of $540,000 ("Arizona Judgment").  *Id.* at 3 ¶ 10, 12 ¶ 79-80; *see also* Ariz. Judgment, Doc. No. 16-5.  The Arizona Judgment summarized the plaintiffs' allegations: "Plaintiffs alleged in the Complaint that Defendant used their images without consent or remuneration, and that the advertisements depicted Plaintiffs in a manner that stated or implied that they were promoting Dream Palace, worked thereat, or were otherwise associated, affiliated, or connected with same."  *Id*. at 3 ¶ 2.  In addition, the parties stipulated that the amount was "reasonable in light of what a jury might reasonably award in compensation attributable to Defendant's alleged conduct coupled with the amount of attorneys' fees and costs. . . ."  *Id.* at 4 ¶ 7.

As a result of the Arizona Judgment, instant plaintiffs Jessica Burciaga, Brooke Banx, Lina Posada, Joanna Krupa, Marta Andretti, Arianny Celeste Lopez, and Abigail Ratchford were

assigned Liberty's rights in its First Mercury insurance policy.  Compl., Doc. No. 1., at 3 ¶¶ 12, 13.

### c.   The Texas Action

Plaintiffs Tara Leigh Patrick and Cielo Jean Gibson (collectively, "the Texas Plaintiffs") sued KHG of San Antonio in the United States District Court for the Western District of Texas.[2] Compl., Doc. No. 1, at 3 ¶ 6; *Patrick, et al. v. KHG of San Antonio, et al.*, Dkt. No. 18-cv-910 (W.D. Tex. Aug. 31, 2018) ("the *Texas Action*").

The Texas Plaintiffs alleged that KHG, owner of Tiffany's Cabaret, had used their images in advertising without their authorization "to promote [KHG's] strip clubs," even though they had never been "associated with" KHG, received no renumeration for its use of their images, and the use "create[d] the false impression . . . that [they] worked as strippers at . . . or endorsed" KHG's club.  *See generally* Tex. Compl., Doc. No. 19-2 ("Texas Complaint").

The Texas Plaintiffs principally alleged that KHG used each plaintiff's image in advertising without her consent to "promote" the "strip club," even though each plaintiff had never been "affiliated with or employed by" Tiffany's Cabaret, received no remuneration for the club's use of her images, and the use "create[d] the false impression" that each plaintiff had "worked at" or "endorsed" the club.  Tex. Compl., Doc. No. 19-2, at 1 ¶ 1, 10 ¶¶ 34-35, 11 ¶ 40-47 ("Texas Complaint").  As a result, each plaintiff was harmed by the "implication" that she was a "stripper working in a sexually-oriented business."  *Id.* at 11 ¶ 43.  The Texas Plaintiffs alleged, on information and belief, that KHG did so "with the intent of causing" each plaintiff "irreparable harm."  *Id.* at 12 ¶ 50.

---

[2] Collectively, the Connecticut, Arizona, and Texas Actions are the "Underlying Lawsuits." Collectively, the Connecticut, Arizona, and Texas plaintiffs are the "Underlying Plaintiffs." Collectively, Connecticut, Arizona, and Texas Defendants are the "Underlying Defendants."

In addition, like the Connecticut Plaintiffs, the Texas Plaintiffs alleged that KHG was "at least negligent in publishing Plaintiffs' Images because they knew, or should have known, that Plaintiffs were not employed by the Club, had no affiliation with the Club, had not consented to the use of their Images, and had not been compensated for the use of their Images;" "negligent in their failure to promulgate policies and procedures concerning the misappropriation of the Images of models that were used on the KHG websites and social media accounts;" or that KHG had "negligently failed to enforce those policies, communicate them to employees, and/or supervise their employees in order to ensure that these policies, along with [f]ederal and Illinois [sic] law, were not violated." *Id.* at 19 ¶ 98, 20-21 ¶¶ 107-109.

The Texas Plaintiffs brought suit for (1) violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1); (2) violation of each plaintiff's common law right of privacy as pertains to the defendants' appropriation of their likeness; (3) violation of each plaintiff's common law right of privacy and publicity; (4) defamation; and (6) various common law torts. *Id.* at 1 ¶ 2.

After the Texas Action was filed, KHG tendered the complaint to its insurer, First Mercury, and First Mercury denied defense and coverage to KHG, asserting that the relevant commercial general liability policies excluded the alleged conduct from coverage. Compl., Doc. No. 1, at 12 ¶ 82, 14 ¶¶ 96-67.

The parties to the *Texas Action* entered into a consent judgment of $230,000 ("Texas Judgment"). *Id.* at 3 ¶ 10, 15 ¶ 104. Therein, KHG admitted that:

> (2) The ads depicted Plaintiffs' images in a manner that implied they were promoting the Defendant's club or would appear at Defendant's club on the advertised dates.
>
> (3) The use of the images was without Plaintiffs' consent or permission and constituted an unauthorized publication of Plaintiffs' names and likeness.

(4) The use of such images was defamatory and constituted an invasion of Plaintiffs' right of privacy in the use of their image and likeness.

Tex. Judgment, Doc. No. 16-6, at 4 ¶¶ 2-4.

As a result of the Texas Judgment, instant plaintiffs Tara Leigh Patrick and Cielo Jean Gibson were assigned KHG's rights in its First Mercury insurance policy.  Compl., Doc. No. 1, at 3 ¶¶ 12, 13.

B.  <u>The First Mercury Policies</u>

Each Underlying Defendant secured and maintained a materially identical commercial general liability insurance policy from First Mercury ("the Policy").  *Id.* at 6 ¶ 34, 9 ¶ 58, 12 ¶ 82.

The Policy included coverage for "Personal and Advertising Injury."  *Id.* at 7 ¶ 39, 10 ¶ 62, 13 ¶ 87.  Specifically, it provided:

1.  Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

Mr. Happy's Policy, Doc. No. 16-7, at 11.

The Policy defined "[p]ersonal and advertising injury" as "injury . . . arising out of one or more" of the following relevant "offenses:"

d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;

    \*     \*     \*

> g. Infringing upon another's copyright . . . in your "advertisement".

*Id.* at 16; *see also* Compl., Doc. No. 1, at 13 ¶¶ 87-90, 10 ¶¶ 62-65.

The Policy defined "advertisement" as:

> [A] notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
>
> a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and
>
> b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

Mr. Happy's Policy, Doc. No. 16-7, at 22; *see also* Compl., Doc. No. 1, at 7 ¶ 43, 10 ¶ 66, 13 ¶ 91.

The Policy also contained two salient exclusions from coverage.[3]

In the "'Knowing Violation of Rights of Another' Exclusion," the Policy barred from coverage "[p]ersonal and advertising injury" that was "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Mr. Happy's Policy, Doc. No. 16-7, at 16.

In the "'Material Published with Knowledge of Falsity' Exclusion," the Policy barred from coverage "[p]ersonal and advertising injury" that "ar[ose] out of oral or written publication of material, if done or at the direction of the insured with knowledge of its falsity." *Id.*

In addition, the Policy also contained a "'Field of Entertainment– Limitation of Coverage' Endorsement," providing in pertinent part:

---

[3] The plaintiffs refer to the relevant policy exclusions, but they do not include them in their complaint. *See* Compl., Doc. No. 1, at 8 ¶ 49, 11 ¶ 72, 14 ¶ 97. Nevertheless, this Court may consider them because they are "integral" to the complaint. *See Chambers*, 282 F.3d at 152-53.

This insurance does not apply to "bodily injury," "property damage," "personal and advertising injury," or "injury" actually or allegedly arising out of, related to, caused by or attributed to by any of the following, but only as each applies to the "Business of The Insured in The Field of Entertainment."

    a.   Invasion of the right to privacy;

    b.   Infringement of copyright, whether under statutory or common law; libel, slander or other forms of defamation. . . .

*Id.* at 55.

The Policy defined "Business of The Insured in The Field of Entertainment" as:

    a.   The production, pre-production, post-production, distribution, exploitation and exhibition of motion pictures, video productions, television programs, commercial or educational films, live performances, audio recordings, phonograph records, electrical transcriptions, sheet music or other similar properties and projects;

    b.   The conduct of any players, entertainers or musicians in any show, theatrical performance or exhibition;

    c.   The ownership, licensing, operation maintenance or use of merchandising programs, advertising or publicity material or paraphernalia, characters or ideas, whether or not on premises of the insured or in possession of the insured at the time of the alleged offense or "occurrence";

    d.   The ownership, leasing, operation, maintenance or use of arenas, stadiums, theatres and similar exhibition venues or media;

    e.   The sponsorship, production or promotions of any live performance concert, sporting, or special event.

*Id.*

C. <u>Procedural History</u>

On November 11, 2021, Plaintiffs, as assignees of the applicable Underlying Defendant, filed the instant complaint against First Mercury ("the Complaint"). Compl., Doc. No. 1. Plaintiffs brought causes of action for: (1) breach of contract, (2) declaratory judgment, (3) violation of the Connecticut Unfair Trade Practices Act, and (4) violation of the Connecticut

Unfair Insurance Practices Act.  Compl., Doc. No. 1, at 15-19.  They seek the costs and expenses

incurred in the underlying actions; a declaration that First Mercury owed the Underlying

Defendants a defense and indemnification under the operative First Mercury insurance policies;

the full amount of the judgements; costs, disbursements, and attorneys' fees in this action; and

interest. *Id.* at 20.

On January 28, 2022, First Mercury moved to dismiss the Complaint.  Def.'s Mot. to

Dismiss, Doc. No. 14.  In First Mercury's view, the Underlying Plaintiffs alleged that

Underlying Defendants knowingly published false material to advance their business interests,

and that they have admitted to doing so.  As a result, First Mercury asserts that the alleged

conduct is not covered by the Policy.  On February 18, 2022, Plaintiffs opposed the motion.  Pls.'

Opp'n, Doc. No. 19.  On March 11, 2022, First Mercury replied.  Def.'s Reply, Doc. No. 28.

I heard oral argument on the motion on June 15, 2022.  Min. Entry, Doc. No. 32.

## II.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to

assay the weight of evidence which might be offered in support thereof."  *Ryder Energy*

*Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)

(quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true, draw all reasonable inferences in favor of the

plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may rely upon "any written instrument" attached to the complaint as an exhibit or "any statements or documents incorporated in it by reference." *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d. Cir. 2002). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id*.

**III.   Discussion**

A.   <u>Principles of Law</u>

1.   *Choice of Law*

"A federal court sitting in diversity . . . must apply the choice of law rules of the forum

state." *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941); *Rogers v. Grimaldi*, 875

F.2d 994, 1002 (2d Cir. 1989).  However, when there is no actual conflict between the states'

relevant law— that is, when "the laws of both states relevant to the set of facts are the same, or

would produce the same decision in the lawsuit," *Nat'l Council on Compensation Ins., Inc. v.

Caro & Graifman, P.C.*, 2008 WL 450413, at *19 (D. Conn. Feb. 15, 2008) (cleaned up)— there

is no need to undertake a choice of law analysis.  *See Metro. Life Ins. Co. v. Aetna Cas. and Sur.

Co*., 255 Conn. 295, 302 n.7 (2001) (explaining, in affirming trial court's judgment, that the

"trial court did not undertake a choice of law analysis" because "there was no conflict between

New York and Connecticut law").  In such a case, a court should "decide [the case] under the

law that is common to both states." *Gen. Star Indem. Co. v. Travelers Indem. Co*., 2013 WL

1849285, at *8 (Conn. Super. Ct. Apr. 9, 2013) (cleaned up).

When no party has made a showing of a conflict of law, the Court need not conduct a

choice of law analysis.  *See, e.g.*, *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 n.12 (2d Cir. 2013)

("Because there is no conflict between the relevant substantive law in these states, however, we

dispense with any choice of law analysis.").  Accordingly, unless the parties identify otherwise, I

may presume that Connecticut law governs.  *W. Dermatology Consultants, P.C. v. VitalWorks,

Inc.*, 322 Conn. 541, 558 n.13 (2016).

2. *Principles of Insurance Policy Construction*

Under Connecticut law, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583 (1990). "The determinative question is the intent of the parties, that is, what coverage the plaintiff expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy." *Id.* (cleaned up). "If the words in the policy are plain and unambiguous . . . the language . . . must be accorded its natural and ordinary meaning." *Id.* (cleaned up). If the policy is ambiguous, "such ambiguity is resolved against the insurance company." *Id.* at 584 (cleaned up). "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Connecticut Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 6 (2008) (cleaned up). "The burden of proving that an exclusion applies is on the insurer, but the insured has the burden of proving that an exception to an exclusion reinstates coverage." *Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 787-88 n.24 (2013) (citing *Buell Indus.*, 259 Conn. at 551).

B. <u>Breach of Contract and Declaratory Judgment</u>

In Count One, Plaintiffs argue that First Mercury breached its contractual obligation to defend and indemnify the Underlying Defendants in the Underlying Actions, because the claims fall within the scope of coverage for "Advertising Injury" pursuant to the terms of the First Mercury Policy, and the Underlying Defendants made a proper demand for coverage and submitted timely notice of the lawsuits. Compl., Doc. No. 1, at 15-16 ¶¶ 107-115. In Count Two, Plaintiffs seek a declaration that First Mercury has a duty to defend and indemnify the

Underlying Defendants in the Underlying Actions.  *Id.* at 16 ¶¶ 116-119.   In response, First Mercury asserts that the Policies exclude or otherwise limit coverage for the conduct alleged in the Underlying Actions, and therefore that it has not breached any contractual obligations to defend and indemnify the Underlying Defendants.  Def.'s Mem. of Law, Doc. No. 15, at 16-20.

Applying those principles, I evaluate in turn the respective duties to defend and to indemnify.

1. *Plaintiffs plausibly allege that first mercury had a duty to defend the Underlying Defendants and breached that duty.*

The Underlying Plaintiffs' alternative pleading of intentional conduct and negligent or recklessly indifferent conduct is sufficient to plausibly allege that First Mercury had a duty to defend the Underlying Defendants.  Pls.' Opp'n, Doc. No. 19, at 2, 6.

Courts determine whether a duty to defend exists by comparing the contractual language with the allegations in the underlying complaint.  *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 448 (D. Conn. 2010) (citing *Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins.*, 274 Conn. 457, 463 (2005).); *accord Quihuis v. State Farm Mut. Auto. Ins. Co.,* 334 P.3d 719, 726 (Ariz. 2014) ("allegations of a plaintiff's complaint generally trigger a liability insurer's duty to defend"); *Don's Bldg. Supply,* 267 S.W.3d at 31 ("Under the 'eight corners' rule of Texas insurance law, the insurer's defense duty turns on the policy's terms and the plaintiff's allegations.").  "Because the duty to defend has a broader aspect than the duty to indemnify . . . , [i]f an allegation . . . falls even *possibly* within the coverage, then the insurance company must defend the insured."  *Mara*, 699 F. Supp. 2d at 448 (emphasis in original); *accord Quihuis*, 334 P.3d at 726.

In an insurance case, "construction of an insurance contract presents a question of law for the court."  *Aetna Life & Cas. Co. v. Bulaong*, 218 Conn. 51, 58 (1991); *accord Sparks v.*

*Republic Nat. Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982); *Don's Bldg. Supply.*, 267 S.W.3d at 23. "Where the terms of an insurance policy are plain and unambiguous, the language is to be interpreted according to its natural and ordinary meaning." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 163 (D. Conn. 2014) (citing *Poole v. City of Waterbury*, 266 Conn. 68, 88 (2003)); *accord Sparks*, 647 P.2d at 1132; *Don's Bldg. Supply,* 267 S.W.3d at 23. "The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." *Travelers Cas. & Sur. Co. v. Neth. Ins. Co.*, 312 Conn. 714, 740 (2014) (quoting *Metro. Life Ins. Co.*, 255 Conn. at 305–06). "Nevertheless, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Poole*, 266 Conn. at 88. "Any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Lexington Ins. Co. v. Lexington Healthcare Grp.*, 311 Conn. 29, 38 (Conn. 2014); *accord Sparks*, 647 P.2d at 1132; *Don's Bldg. Supply,* 267 S.W.3d at 23.

Plaintiffs assert that the alleged misconduct is covered "Personal and Advertising Injury," because it consists of injuries arising from "[o]ral or written publication, in any manner" of content that "slanders or libels a person or organization or disparages a person's or organization's goods, products or services," that "violates a person's right of privacy," or that "infring[es] upon another's copyright" in an advertisement. Compl., Doc. No. 1, at 13 ¶¶ 87-90, 10 ¶¶ 62-65. First Mercury disagrees, arguing that the alleged "personal and advertising injury" is not covered by the Policy.

Like Plaintiffs, I embrace the reasoning of *First Mercury Ins. Co. v. Triple Location, LLC*, 536 F. Supp. 3d 326 (N.D. Ill. 2021), whereby the Northern District of Illinois determined that First Mercury had a duty to defend a gentlemen's club insured in a substantially identical

underlying litigation.  *Id.* at 333.  There, models sued defendant Triple Location for unauthorized

use of their images in the club's advertising.  *Id.* at 327-28.  Triple Location, apparently insured

under a materially identical First Mercury general liability policy, requested a defense and

indemnification.  *Id.* at 327.  First Mercury denied the request, pointing to the same policy

provisions at issue in the case at bar.  *Id.* at 328.  First Mercury sought summary judgment on its

request for a declaration that it had no duty to defend or indemnify the club in the underlying

litigation.  *Id.* at 328-30.

       The *Triple Location* court held that First Mercury had a duty to defend the club.  It

reasoned that "[r]esolving the case require[d] attention only to the negligence claims," the same

negligence claims alleged here in the Connecticut and Texas Actions, that the insured club

"negligent[ly]" failed to "promulgate policies and procedures concerning the misappropriation of

the [i]mages" of the plaintiff models used on the insured's website and social media, and/or that

it had negligently failed to enforce those policies."  *Id*. at 327.  Even though the underlying

complaint in that case also alleged "intentional acts of misappropriation," and the club

"necessarily [could not] have done [those acts] negligently," such intentional misconduct was not

the end of the story.  *Id.* at 330.  Rather, the Federal Rules of Civil Procedure permit alternative

pleading, and the underlying plaintiffs had pleaded theories of both negligent and intentional

conduct in the alternative.  *Id.* (citing to Fed. R. Civ. P. 8(d)(3)).  As a result, Rule 8(d)(3)

necessarily "defeat[ed] First Mercury's contention that the complaint does not or cannot allege

negligent conduct because it also alleges intentional conduct."  *Id.*  Therefore, Triple Location's

alleged negligent failure to adopt and/or implement anti-misappropriation policies "arguably

f[ell] within at least one of the categories of wrongdoing listed in the policy," a policy that did

not exclude "negligent" conduct.  *Id.* at 330-31.  Accordingly, the court concluded, First Mercury had a duty to defend Triple Location in the underlying lawsuit.[4]

The same fact— that the Underlying Plaintiffs pleaded intentional conduct and non-intentional conduct in the alternative— disposes of First Mercury's motion to dismiss the breach of contract and declaratory judgment claims in the instant action, at least with respect to the duty to defend.  The Connecticut and Texas Plaintiffs expressly alleged that the Mr. Happy's Defendants and KHG were "negligent in [their] failure to promulgate policies and procedures concerning the misappropriation" of the plaintiffs' images; that if Mr. Happy's Defendants and KHG had such policies, they "negligently failed to enforce th[em], communicate them to employees, and/or supervise their employees in order to ensure that these policies, along with [f]ederal and [state] law, were not violated;" and that the Mr. Happy's Defendants and KHG were "at least negligent in publishing [Underlying] Plaintiffs' Images. . . ."  Conn. Compl., Doc. No. 19-1, at 20 ¶ 147, 22 ¶¶ 155-57; Tex. Compl., Doc. No. 19-2, at 19 ¶ 98, 20-21 ¶¶ 107-09. The Arizona complaint is different, alleging that Liberty "acted at a minimum . . . with reckless indifference" by "expressly permitting, allowing and condoning" the use of the plaintiffs' images on its website and/or social media, and that Liberty acted with "reckless indifference about whether the posting of [the Arizona] Plaintiffs' images . . . would create a false and misleading impression about the [Arizona] Plaintiffs."  Ariz. Compl., Doc. No. 19-3, at 18 ¶ 56, 23 ¶ 88. But the Arizona Complaint is characterized by the same pleading in the alternative sufficient to plausibly allege that First Mercury owed Liberty a duty to defend.

---

[4] To the extent that First Mercury argues that *Triple Location* is "inapposite" and "has no bearing on the instant dispute" because the trial court only addressed the duty to defend and declined to reach indemnification, I only rely on the decision in the context of analyzing the duty to defend.  *See* Doc. No. 28, at 12.  As a result, First Mercury's attempt to distinguish the decision on that basis is unpersuasive.

None of the policy provisions invoked by First Mercury excludes the Underlying Defendants' alleged negligent or recklessly indifferent conduct from the policy's coverage for "personal and advertising injury." Accordingly, Plaintiffs plausibly allege that First Mercury owed the Underlying Defendants a duty to defend.

     a.  The "Knowing Violation of Rights of Another" Exclusion does not bar coverage for the allegations of negligent or recklessly indifferent conduct.

First Mercury argues that coverage is precluded by the "Knowing Violation of Rights of Another" Exclusion, which bars coverage for "'personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Def.'s Mem. of Law, Doc. No. 15, at 16-17. "[E]xclusions from insurance policy coverage," such as this one, receive "strict construction" and are "interpreted in a manner most beneficial to the insured." *Mara*, 699 F. Supp. 2d at 447 (citing *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir. 1994)). On its face, the "Knowing Violation of Rights of Another" Exclusion only applies when the insured acted while *knowing* that its conduct would violate the rights of another. Accordingly, the exclusion does not preclude coverage of unknowing conduct, including the alleged negligent or recklessly indifferent conduct.

First Mercury does not dispute the meaning of the exclusion; instead, it attacks the Plaintiffs' characterization of the underlying allegations. Def.'s Mem. of Law, Doc. No. 15, at 18 (quoting Tex. Compl., Doc. No. 16-2, at 6 ¶ 18 and arguing that the alleged misconduct was "undertaken with full knowledge of the obvious consequences" and that it "cannot possibly be argued that publishing a picture of a world-famous model, who is plainly not an employee of the strip club (and whose livelihood depends on her public image), in an advertisement for

'tabledances,' is done in any manner other than 'intentionally' or 'knowingly'").  In my view, however, the caselaw on which First Mercury relies for its argument is distinguishable.

For this proposition, First Mercury initially cites to *Awards Depot, LLC v. Scottsdale Ins. Co.*, 2016 WL 613909 (S.D. Tex. Feb. 16, 2016), *reconsideration denied*, 2016 WL 1090110 (S.D. Tex. Mar. 21, 2016).  There, the underlying plaintiff alleged that the underlying defendant had acted "knowingly" and "willfully" to violate the plaintiff's intellectual property rights and, accordingly, inflicted "personal and advertising injury" within the terms of the policy.  *Id.* at *3. The *Awards Depot* court declared that the defendant-insured's identical "Knowing Violation of Rights of Another" Exclusion barred coverage for the alleged infringements and, therefore, that the insurer had no duty to defend the insured in the underlying lawsuit.  *Id.* at 2-3.  However, the court expressly (and distinguishably) concluded that there were "no allegations . . . that suggest that [the underlying defendant] acted other than with such knowledge" that its conduct would violate the plaintiff's rights in trade dress.  *Id.* at *3.  Here, however, the Underlying Plaintiffs also allege negligent and recklessly indifferent conduct— conduct that plausibly could have given rise to unknowingly violating the Plaintiffs' rights.  Therefore, *Awards Depot* does not shed light on the core issue with regard to the duty to defend: whether First Mercury has a duty to defend arising from the Underlying Plaintiffs' allegations of negligence or recklessness.  *See* Pls.' Opp'n, Doc. No. 19, at 10 (arguing same).

Next, First Mercury cites to *Allstate Ins. Co. v. Russell*, 2021 WL 4061403 (N.D. Tex. Sept. 7, 2021), which also construed an identical "Knowing Violation of the Rights of Another" Exclusion.  Def.'s Mem. of Law, Doc. No. 15, at 16-17; Def.'s Reply, Doc. No. 28, at 12-13. There, the plaintiff alleged that her former employer invaded her privacy and defamed her by publishing her intimate photographs.  *Russell*, 2021 WL 4051403. at *1.  The former employer

sought a defense and indemnification for the plaintiff's claims, which the insurer denied. *Id*. at

*3. The *Russell* court granted summary judgment to the insurer, reasoning that that employer

had "intentionally disclosed the photos" and "should have reasonably anticipated and known that

[the employer's] act would violate [the plaintiff's] rights." *Id*. at *3. Therefore, the alleged

conduct fell within the exclusion and was not covered by the policy. *Id.*

Like Texas law, Connecticut law recognizes that "merely describing an action in terms of

negligence is of no consequence when the action itself can only be deemed intentional." *Mara*,

699 F. Supp. 2d at 457 (quotation marks and citation omitted). But the line of precedent

including *Russell* and *Mara* is distinguishable, because that line of precedent address factual

allegations concerning harm of an intimate or personal nature. In *Russell*, the defendant shared

intimate photos of a colleague with others who knew her personally. 2021 WL 4061403 at *1.

In *Mara*, the white supremacist defendant intended to menace his neighbors of color by, *inter*

*alia*, shooting bottle rockets at his neighbor's home. 699 F. Supp 2d at 451. Other cases in that

line feature analogous harms, such as sexual assault, sexual exploitation of minors, assault and

battery, or violent acts. *E.g., Farmers Texas Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82

(Tex. 1997) (reasoning that a random, but targeted, act of gun violence was necessarily

intentional); *Chicago Ins. Co. v. Manterola*, 955 P.2d 982, 985 (Ariz. Ct. App. 1998)

(concluding that molestation of a minor fell outside of professional negligence liability

coverage). Those acts cannot have been done negligently and without knowledge of the harms

they caused. In other words, one could not reasonably allege the problems in *Russell*, *Mara*, and

*Manterola* were failure to promulgate policies for employees barring the unauthorized sharing of

a colleague's intimate photos, racist victimization of neighbors, or the sexual assault of a minor.

The case at bar is different.  Plaintiffs are professional models.  Compl., Doc. No. 1, at 4 ¶ 20.  Unlike in *Russell*, the Underlying Defendants did not reveal *private* images.  Instead, the Underlying Defendants allegedly misused public images by failing to engage in arms-length contracting for the rights to use the images and likenesses, or to employ the Underlying Plaintiffs for the purpose of advertising the insured establishments; and, as a result of the Plaintiff's inability to decline the presumably undesired job opportunities, the Underlying Defendants allegedly tarnished the models' reputation by imputed affiliation.  *Id.* at 2 ¶ 3.  The harm alleged is business and could plausibly have arisen from a failure to promulgate adequate business policies, enforce those policies, and/or supervise employees.  Accordingly, assuming *arguendo* that the Underlying Defendants' alleged misconduct caused Plaintiffs harm, the allegations do not give rise to the same unrebuttable presumption of knowing harm illustrated by cases like *Russell*, *Mara*, and *Manterola*.

Finally, First Mercury's assertion that the Underlying Actions have been "fully litigated" is of no consequence for the purpose of assessing First Mercury's duty to defend the Underlying Defendants in the underlying actions. Def.'s Mot. to Dismiss, Doc. No. 15, at 18.  To determine First Mercury's duty to defend, I must look to the pleadings.  First Mercury does not offer any authority for the proposition that the factual posture of this proceeding requires departing from well-settled law that the duty to defend arises from the allegations in the complaint, not from findings or stipulations of fact.

   b.  The "Material Published with Knowledge of Falsity" Exclusion does not bar
       coverage for the allegations of negligent or recklessly indifferent conduct.

First Mercury also asserts that the "Material Published with Knowledge of Falsity" Exclusion— which precludes coverage for "personal and advertising injury," including the publication of material that "slanders or libels" a person, "violates a person's right of privacy,"

or "[i]nfring[es] upon another's copyright," "done at the direction of the insured with knowledge of its falsity"— bars coverage for the underlying allegations. *Id.* at 14.  I disagree.

For support, First Mercury relies on *Atlas Fencing v. Hartford Ins. Co*., 2004 WL 1925892 (Conn. Super. Ct. July 23, 2004).  There, a competitor sued Atlas Fencing ("Atlas") for an alleged bait-and-switch scheme by which Atlas used the competitor's intellectual property in its advertisements and then sold buyers an Atlas product. *Id.* at *4.  Atlas argued that its infringement was non-willful, and therefore that its defense and indemnification was not precluded by a policy exclusion for intentional acts. *Id.* at *5.  The Connecticut Superior Court disagreed, reasoning that the competitor's complaint "alleged only volitional acts" and that "[c]opying and distributing copyrighted work of the owner connotes actions that are of the type expected to inflict an advertising injury and which were not accidental." *Id.* at *5, *7.

However, *Atlas* is distinguishable.  There, the court reviewed the allegations, and it concluded that the alleged misconduct only included volitional acts. *Id.* at *6.  Here, I have recognized that the Underlying Plaintiffs alleged negligent and/or recklessly indifferent conduct. *Atlas*, then, is inapposite for purposes of evaluating whether allegations of negligent or recklessly indifferent conduct may give rise to a duty to defend.  In addition, the issue in *Atlas* was whether acts were accidental or not; here, I assess whether the allegations of negligent or recklessly indifferent conduct were merely not intentional.

      c.  The "Field of Entertainment – Limitation of Coverage" Endorsement does not bar coverage for the allegations of negligent or recklessly indifferent conduct.

First Mercury further argues that the duty to defend is precluded by the "Field of Entertainment – Limitation of Coverage" Endorsement, Doc. No. 16-7, at 15-16, which excludes coverage for "personal or advertising injury" arising out of "[i]nvasion of the right to privacy;" "[i]nfringement of copyright;" "libel, slander or other forms of defamation;" and "unfair trade

23

practices" as applied to business in the field of entertainment, Mr. Happy's Policy, Doc. No. 16-7, at 55.  I am not persuaded.

An endorsement is "a term of art," defined as "as 'a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions from coverage. . . . When properly incorporated into the policy, the policy and the . . . endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties." *Dairyland Ins. Co. v. Mitchell*, 320 Conn. 205, 213 (2016) (quoting *Liberty Mutual Ins. Co. v. Lone Star Industries, Inc*., 290 Conn. 767, 806 (2009)).  If an endorsement is inconsistent with the body of the insurance policy, the endorsement generally supersedes the body of the policy and controls.  *Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 510 (2002).  However, if an endorsement creates an ambiguity, then the policy must be construed in favor of coverage.  *Id.* at 512.

In my view, the "Field of Entertainment – Limitation of Coverage" Endorsement yields ambiguity that, for the purpose of assessing its duty to defend, must be resolved in the Underlying Defendants' favor.  I agree with the Northern District of Illinois's analysis of an identical field of entertainment endorsement:

> Adopting First Mercury's position that the endorsement negates its duty to defend [the underlying defendant] in the underlying suit would mean that the policies cover "personal and advertising injury" caused by negligence associated with privacy right or copyright infringement in "[the insured's] 'advertisement[s]'" or with "[t]he use of another's advertising idea in [the insured's] 'advertisement[s],'" yet exclude the very same injury if it arises out of the insured's "advertising[.]"  In other words, the policies would grant coverage for "personal and advertising injury" caused by negligence associated with the insured's "advertisement[s]," but the endorsement would remove such coverage if the injury arose from the insured's engaging in "advertising."  Given the stark incompatibility of these dueling provisions, the endorsement creates an ambiguity about the scope of coverage that, at least for purposes of the duty to defend, must be resolved in [the underlying defendant's] favor. . . .

24

*Triple Location*, 536 F. Supp. 3d at 333 (citations omitted).

I also agree with the Southern District of Florida in its analysis of a materially identical field of entertainment endorsement in a nearly-identical case, whereby an insurer sought a declaratory judgment that it had no duty to defend or indemnify its insured bar owner in an underlying lawsuit alleging that the bar owner had unauthorizedly used eight models' images and likenesses in advertisements. *See Princeton Express v. DM Ventures USA LLC*, 209 F. Supp. 3d 1252, 1254-55 (S.D. Fla. 2016). There, the insurer requested a declaration that its field of entertainment exclusion precluded any duty to defend or indemnify, and the court held that the policy was illusory after concluding that the exclusion "essentially eliminates all advertising injury coverage." *Id.* at 1255-60. "Because the policies provide that they cover advertising injury, and then the Exclusion provides that advertising injury is excluded," the *Princeton Express* court held, "the provisions are completely contradicted" and coverage was not excluded. *Id.* at 1260.

Here, First Mercury does not rebut the commonsense conclusion that the exception set forth in the "Field of Entertainment – Limitation of Coverage" Endorsement swallows the whole. Under Connecticut law, exclusionary language that altogether eliminates coverage renders coverage illusory. *Karas v. Liberty Ins. Corp.*, 335 Conn. 62, 106 (2019). The question is whether the "grant of coverage in [the exclusion or limitation] is broader than the exclusion" itself. *Connecticut Ins. Guar. Ass'n v. Drown*, 134 Conn. App. 140, 153 (2012), *aff'd*, 314 Conn. 161 (2014). In its reply brief, First Mercury's own explanation of the endorsement— that the endorsement "without equivocation, indicates that a 'personal or advertising injury' does not include any 'invasion of the right to privacy' and/or 'libel, slander or other forms of defamation' where it relates to the insured's advertising practices"— demonstrates that the insurer

understands that the grant of coverage is narrower than the exclusion, because the policy purports to provide coverage for advertising injury then bars such coverage when the alleged injury arises from advertising.  Def.'s Reply, Doc. No. 28, at 7.  Such a policy is inherently ambiguous.

Under Connecticut law, "a policy provision offering coverage for a particular peril will not be deemed illusory unless it would not result in coverage under any reasonably expected set of circumstances." *Karas*, 335 Conn. at 108.  At oral argument, First Mercury pointed to examples in which the policy would apply, *e.g.*, for a live performance promoting the insured business, for use of the insured's venue by a third-party for a special event, or when an insured falsely accuses a vendor of engaging in criminal activity.[5]  The Court must evaluate competing interpretations of a policy from the perspective of a reasonable insured.  *Ceci v. National Indem. Co.*, 225 Conn. 165, 168 (1993) ("The provisions of [an insurance policy] cannot be construed in a vacuum. . . .  They should be construed from the perspective of a reasonable layperson in the position of the purchaser of the policy. . . .") (internal citations omitted).  In my view, the examples First Mercury provides are outside of the reasonable set of circumstances in which an insured club might expect to be covered.  Therefore, they do not rebut my conclusion that coverage under the "Field of Entertainment – Limitation of Coverage" Endorsement appears to be ambiguous or even illusory.

Accordingly, I cannot conclude that the endorsement precludes coverage of the underlying allegations.

---

[5] First Mercury also criticized the *Triple Location* decision because the company had not raised nor briefed that coverage was excluded due to the "Field of Entertainment – Limitation of Coverage" Endorsement in that case, but First Mercury squarely presents the issue here.

    d.  The Policy does not include an express exclusion for "negligence or other wrongdoing" that may exclude coverage.

Finally, I observe that the Policy does not include an applicable negligence exclusion. For example, in the context of aircraft, auto, or watercraft activities, the Policy expressly excludes coverage for "negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured."  Mr. Happy's Policy, Doc. No. 16-7, at 14. Elsewhere, an identical exclusion has barred coverage for a claim of negligent supervision.  *E.g.*, *Westfield Ins. Co. v. Matulis*, 421 F. Supp. 3d 331, 347, 350 (S.D.W. Va. 2019).

In this case, although the Policy contained a negligence exclusion directed towards activities, there was no negligence exclusion applicable to the underlying factual allegations.  As a general rule, a court will not read into a contract language that its drafters could have and decided not to include.

    e.  Plaintiffs plausibly allege that First Mercury owed the Underlying Defendants a duty to defend them and breached that duty.

The Plaintiffs plausibly allege that the Underlying Defendants' policies covered the non-intentional allegations in the Underlying Plaintiff's complaints; therefore, Plaintiffs sufficiently allege that First Mercury owed the Underlying Defendants a duty to defend them in the underlying litigation, if only under a reservation of the insurer's rights, to survive this motion to dismiss the declaratory judgment claim with respect to the duty to defend.  Furthermore, Plaintiffs allege that First Mercury failed to defend the Underlying Defendants.  Therefore, Plaintiffs plausibly allege that First Mercury breached its duty to defend the Underlying Defendants.

Accordingly, First Mercury's motion to dismiss the breach of contract and declaratory judgment claims relating to the duty to defend is denied.

2.   *Resolving the duty to indemnify is premature.*

An insurer asserting that a claim is not covered may "either refuse to defend or it [may]

defend under a reservation of its right to contest coverage under the various avenues which

would subsequently be open to it for that purpose." *Missionaries of the Company of Mary, Inc.*

*v. Aetna Casualty & Surety Co.*, 155 Conn. 104, 113 (1967).  However, if an insurer effectively

waives the opportunity to defend under a reservation and then breaches its duty to defend, it

"bears the consequences of its decision." *Capstone Bldg. Corp. v. American Motorists Ins. Co.*,

308 Conn. 760, 806 (2013) (quotation marks and citations omitted); *Damron v. Sledge,* 460 P.2d

997, 1001 (Ariz. 1969) ("If the company refuses to defend at all, it must accept the risk[s]. . . .").

In all three jurisdictions at issue here, if the insured was actually liable for the alleged conduct,

the consequences for First Mercury breaching its duty to defend include paying for a reasonable

settlement, such as the resolutions in the three underlying actions, and attorneys' fees incurred in

defense of the underlying suit and in negotiating a resolution.[6]

---

[6] In Connecticut, the consequences of breaching a duty to defend include paying for "any reasonable settlement agreed to by the plaintiff and the insured, and the costs incurred effectuating the settlement up to the limits of the policy." *Capstone Bldg. Corp.*, 308 Conn. at 806.  But the insured (or its assignee) must carry its "burden of proving that the settlement is reasonable in proportion to the insurer's liability under its duty to defend." *Id.* at 804-05.  If some of the claims at issue would "not independently trigger the insurer's duty to defend," then the breaching insurer's liability is "limited to the portion of the settlement corresponding to claims for which the insurer had a duty to defend," if considered independently.  *Id.* at 815 (citing *DaCruz*, 268 Conn. at 688); *see also Black v. Goodwin, Loomis, and Britton, Inc.*, 239 Conn. 144, 153 (1996) (holding that these rules apply to assignees of insureds).  On that basis, the insurer may assert that the amount of the settlement was too high.  *Capstone Bldg. Corp.*, 308 Conn. at 815.  To determine whether a settlement amount was too high, a court may consider "whether there is a significant prospect of an adverse judgment, whether settlement is generally advisable, whether the action is taken in good faith, and whether it is not excessive in amount." *Hartford Roman Catholic Diocesan, Corp.*, 199 F. Supp. 3d at 597 (quoting *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 249 Conn. 36, 56 (1999)).  That is a highly fact-intensive inquiry, for which a trial or hearing may be needed.  *Capstone*, 308 Conn. at 816-17.

In Arizona, when an insurer denies a defense, an insured and an injured party may elect to settle pursuant to a *Damron* agreement, by which "the insured agrees to liability for the underlying incident and assigns all rights against the insurance company to the injured party." *Quihuis v. State Farm Mut. Auto Ins. Co.*, 748 F.3d 911, 912 n.1 (9th Cir. 2014).  However, a *Damron* agreement will not "create coverage that the insured did not purchase" and the insurer is only liable for "a liability falling within its policy." *Evanston Ins. Co. v. Murphy*, 544 F. Supp. 3d 879, 884 n.4 (D. Ariz. 2021), *aff'd*, 2022 WL 1078123 (9th Cir. 2022) (citation omitted).

In Texas, "if an insurer wrongfully denies coverage and its insured then enters into an agreed judgment, the insurer is barred from challenging the reasonableness of the settlement amount." *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 671 (Tex. 2008).

First Mercury suggests that the stipulated judgments sufficiently resolve the factual and legal issues to determine that it has no duty to indemnify the Underlying Defendants.  For example, First Mercury asserts that the underlying actions were "fully litigated," Def.'s Mot. to Dismiss, Doc. No. 15, at 18, and points to the Texas Judgment to argue that the settlements only reference non-covered conduct, Doc. No. 8, at 5.[7]  There, KHG stipulated that its advertisements "depicted Plaintiffs' images in a manner that implied they were promoting the Defendant's club or would appear at Defendant's club on the advertised dates" and did so "without Plaintiffs' consent or permission," "constitu[ting] an unauthorized publication of Plaintiffs' names and likeness," defamatory use, and "an invasion of Plaintiffs' right of privacy in the use of their image and likeness."  Tex. Judgment, Doc. No. 16-6, at 4 ¶¶ 2-4.  Because KHG stipulated to conduct constituting intentional offenses as a matter of law, First Mercury reasons, the alleged misconduct is not covered by KHG's policy.

I cannot conclude that the underlying judgments have the dispositive or preclusive effect on this litigation that First Mercury suggests.  For one, I have not seen the settlement in the Connecticut Action, which was not furnished to the Court by the parties.  First Mercury asserts that because Plaintiffs treat the underlying lawsuits as identical, I should treat the Connecticut settlement, sight unseen, as identical too.  But I will not presume to know what, if any, stipulations of fact or law the Connecticut settlement contains.  Furthermore, although I have access to the terms of the Arizona Judgment, the judgment merely restates the Arizona Plaintiffs' allegations ("Plaintiffs alleged in the Complaint. . .") and does not appear to find any facts.  Ariz. Judgment, Doc. No. 16-5, at 3 ¶ 2.  Even the most fleshed-out judgment, the Texas Judgment, does not resolve factual issues essential for determining whether alleged losses fall within the

---

[7] Notably, First Mercury contradicted that statement at the hearing on the motion to dismiss, stating that the cases were not actually litigated to a verdict.

scope of coverage of the policies: how KHG obtained the images, whether KHG or a third-party created and/or published the advertisements, and why KHG or third-party engaged in the allegedly unlawful conduct.  *See* Pls.' Opp'n, Doc. No. 19, at 6-7.  The duty to indemnify is narrow, including in the context of a stipulated judgment.  The Connecticut Supreme Court has advised that trial or a hearing may be necessary to determine the responsibility of the insurer to indemnify the underlying claims.  *Capstone Bldg. Corp.*, 308 Conn. at 816-17.   First Mercury seeks an end-run around a fact-intensive inquiry, which is not warranted at this time.

Accordingly, First Mercury's motion to dismiss the breach of contract and declaratory judgment claims arising from the duty to indemnify is denied.

### C. Connecticut Unfair Trade Practices Act and Connecticut Unfair Insurance Practices Act Claims

First Mercury further moves to dismiss the Plaintiffs' Connecticut Unfair Insurance Practices Act ("CUIPA") and Connecticut Unfair Trade Practices Act ("CUTPA") claims because "a proper denial of coverage under an insurance policy does not constitute a CUIPA or CUTPA violation," Def.'s Mem of Law, Doc. No. 15, at 21 (citing to *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 163 (D. Conn. 2017) (*quoting Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008)).  The argument is unavailing.

A plaintiff may state a claim under CUTPA, which bars "unfair or deceptive acts or practices in the conduct of any trade or commerce," to enforce an alleged violation of CUIPA, which proscribes "unfair or deceptive act[s] or practice[s] in the business of insurance."  *Kim v. State Farm Fire & Cas. Co.*, 2015 WL 6675532, at *5 (D. Conn. Oct. 30, 2015) (citing *Mead v. Burns*, 199 Conn. 651, 663 (1986)).  CUTPA/CUIPA claims "are premised" on "a breach of contract."  *Kim v. State Farm Fire & Cas. Ins. Co.*, 751 F. App'x 127, 128 n.1 (2d Cir. 2018).

I conclude that Plaintiffs plausibly plead that First Mercury breached its duty to defend the Underlying Defendants.  It follows that I have concluded that Plaintiffs plausibly allege that the denial of a defense was improper.  Furthermore, I conclude that it would be premature to rule on First Mercury's obligation to indemnify the Underlying Defendants.  Because I have not determined that the denial of coverage was proper, I decline to dismiss the Plaintiffs' CUTPA and CUIPA claims at this time.

## IV.      Conclusion

For the foregoing reasons, First Mercury's motion to dismiss, doc. no. [14], is **denied**.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge